



NYU Hospitals Center
550 First Avenue
New York, NY 10016



## PRIVILEGED AND CONFIDENTIAL

To:   Richard Levin, M.D.
      Dean for Graduate Medical Education

From: Mitchell Charap, M.D.
      Chair, Appeals Committee

Date: May 30, 2006

Re:   Report Regarding Neelu Pal, M.D.
      Appeal of Summary Suspension and Termination

       The Appeals Committee, consisting of Drs. Christopher Foresto and Joshua Pasol (residents) and Robert Lembo and myself (faculty), advised by Lynn Lowy (legal counsel) has conducted its hearing of Dr. Neelu Pal's appeal of her summary suspension, effective January 25, 2006 and termination, effective February 21, 2006. In accordance with Article V of the Evaluation, Corrective Action, and Disciplinary Policy for Residents, the following summary of our investigation, conclusions and recommendations is provided:

## I.   PROCEDURE

       Dr. Pal requested an appeal of her summary suspension and termination by letters addressed to Dr. Riles, dated January 31, 2006 and February 24, 2006, respectively. The Appeals Committee held the hearing on May 3, 2006. Prior to meeting with Dr. Pal and her attorney, the Committee reviewed documents and conducted interviews with members of the Department of Surgery and members of the Hospital and School of Medicine staff, who shared information relevant to the incident that precipitated Dr. Pal's suspension and dismissal from the Bariatric Surgery Training Program.

       The Committee discussed the documents listed in Section II.A, which they had received in advance. The Committee interviewed Dr. Thomas Riles, Director of the Surgery Service, Dr. Christine Ren, Director of the Bariatric Surgery Fellowship Program, Dr. George Fielding, a supervising attending and Dr. Carol Bernstein. In addition, the Committee interviewed Ms. Rebecca Fishman and Ms. Mara Epstein, who served as "administrators on call" during the weekend that the Hospital became aware of the phone calls to patients regarding the Bariatric Surgery Program. Following these

**CONFIDENTIAL**                                    D 00289



**PRIVILEGED AND CONFIDENTIAL**

interviews, Dr. Pal presented her appeal accompanied by legal counsel, Jason Solataroff, Esq. of the firm Giskan & Solotaroff.[*] After meeting with Dr. Pal, the Committee reviewed all of the facts presented and reached the conclusions summarized below.

## II. FACT FINDING

A. Documents reviewed by the Committee:

1. *Evaluation, Corrective Action, and Disciplinary Policy for Residents*

2. Letter dated February 28, 2006 from Paul Rooney, Dr. Neelu Pal's attorney, to Lynn Lowy requesting access to a Call Log and On Call Schedules for the period of November 20, 2005-January 25, 2006.

3. Letter dated February 24, 2006 from Paul Rooney to Dr. Thomas Riles requesting appeal of Dr. Pal's dismissal.

4. Notice of Dismissal dated February 21, 2006 from Dr. Riles notifying Dr. Pal of her dismissal.

5. Letter dated February 16, 2006 to Annette Johnson requesting access to information on Dr. Pal's Treo, which was turned in upon her summary suspension on January 25, 2006.

6. Letter dated February 14, 2006 from Dr. Ren to Dr. Richard Levin documenting the events that led to Dr. Pal's suspension.

7. Letter dated February 1, 2006 from Paul Rooney to Lynn Lowy, requesting Dr. Pal's return to the Fellowship Program under an interim Program Director with outside rotations.

8. Letter dated January 31, 2006 from Paul Rooney to Lynn Lowy, requesting copies of all text messages on the Treo.

9. Letter dated January 31, 2006 from Paul Rooney to Dr. Riles requesting appeal of Dr. Pal's summary suspension.

10. Notice of Summary Suspension dated January 25, 2006 from Dr. Riles and Dr. Ren to Dr. Pal.

11. Email dated January 24, 2006 from Dr. Pal to Dr. Bernstein regarding Dr. Pal's patient care concerns and her admission to making phone calls to patients.

12. Weekend Administrator QA Reports dated January 21 and 22, 2006 detailing conversations between weekend administrators on call and the patients who received phone calls from Dr. Pal.

13. Faculty, Medical Staff, House Staff Questionnaire dated May 2005

---

[*] Dr. Pal changed legal counsel during this process. Early correspondence indicates that Dr. Pal was represented by her attorney, Paul Rooney, who was later replaced by Jason Solotaroff.

2



PRIVILEGED AND CONFIDENTIAL

14.   NYU School of Medicine Resident/Fellow/Rotator Application dated May 2005

15.   Letters of recommendation for Dr. Pal dated October and November 2005.

16.   Dr. Pal's CV and credentials

17.   Completed policy forms including: Consent and Disclosure; Patent Policy; Addendum Application Certification; Drug Free Workplace Policy; and Policy Statement on Privacy, Information Security and Confidentiality

18.   Completed Human Resources forms including: Authorization of Direct Deposit; W-4; Benefits Enrollment Form; and Self Identification Form.

19.   Residency Training Program Contract executed in May, June and July 2005 with term revised from 6/27/05-6/26/06 to 10/4/05-10/3/06.

20.   Description of the Fellowship Program.

21.   Email messages delivered to the Committee by Dr. Ren following her interview.

22.   Dr. Pal's Treo Messages delivered to the Committee at the Hearing.

23.   Statement with attached email messages submitted by Dr. Pal at the Hearing.


B.   Interviews:

### 1. March 15, 2006: Ms. Rebecca Fishman, Weekend Administrator On Call

Ms Fishman explained that she worked on Sunday, January 22, 2006 and learned that certain bariatric service patients had received worrying phone calls, warning them against having surgery the following day. Mona Sonnenshein, Senior Vice President for Hospital Operations, asked Ms. Fishman to phone all of the patients scheduled for bariatric surgery on Monday, to see whether other patients had received similar calls. Some patients spoke to the caller and others just noticed that an NYU Medical Center phone number appeared on their caller ID. Those who spoke to the caller described a female voice with an accent, claiming to be an NYU employee, stating that there were serious quality issues with the bariatric surgery program and encouraging them to contact the State Department of Health. She advised them against going through with the scheduled surgery. One of the patients recounted the conversation as: "I really shouldn't be telling you this, but you should know this, you should re-think the surgery." All of the patients called expressed their alarm at having received such a call and stated that they believed the unidentified woman worked at NYU and was knowledgeable about the bariatric service. The hospital's telecommunications department traced the calls and confirmed that they had been placed from an NYU phone number.

The Committee found Ms. Fishman's account of her interactions with the patients to be credible and consistent with the information reported by other witnesses.

3





PRIVILEGED AND CONFIDENTIAL

2.  **April 10, 2006: Dr. Thomas Riles, Director of Surgery Service**

Dr. Riles was asked about his involvement in the decision to suspend and then dismiss Dr. Pal from the Program and why he decided that such disciplinary action was necessary. He stated that the main issue was Dr. Pal's admitted phone calls to patients advising them not to go through with their scheduled surgery. Dr. Riles stated that nothing he knew about the bariatric service or Dr. Pal's experience justified her behavior. In addition, after consulting with Drs. Ren and Fielding, it became apparent that it would be ill-advised to allow her to come back on the service and care for their patients when they did not trust her professional judgment. Dr. Riles clarified that the primary reason for the suspension and termination was the concern for patient welfare that he shared with Drs. Ren and Fielding. In addition, he was dubious about whether the unethical behavior that Dr. Pal had exhibited in making calls frightening patients on the eve of surgery was remediable. Dr. Riles emphasized that while the behavior reported by UMDNJ supported his decision to dismiss Dr. Pal, the extreme act of contacting patients under the circumstances was, alone, enough of threat to patient welfare to warrant her suspension and dismissal.

The Committee believed that Dr. Riles carefully considered the facts regarding the incident and that his decision was made in accordance with applicable procedures and not arbitrarily, capriciously, in bad faith or otherwise in violation of anti-discrimination or other laws or regulations.

3.  **April 10, 2006: Dr. Christine Ren, Bariatric Surgery Program Director**

Dr. Ren recounted the events of the January weekend when she and Dr. Fielding first learned of the phone calls made to their patients. She also described the events of Monday, January 23, 2006 when she told Dr. Pal about the anonymous phone calls and then after starting to work, Dr. Pal went home sick. Dr. Ren reported that later that evening, she learned that the hospital had determined the calls were made from the Same Day Admit area and that the only person who tried to swipe into that unit around the time of the patient calls was Neelu Pal. On Tuesday, Dr. Pal stayed home sick. On Tuesday evening, Dr. Ren called Dr. Pal at home to see how she was feeling and to confirm that she would be at the meeting the following morning. During that call, Dr. Pal confessed to phoning the patients over the weekend. Following that call, Dr. Ren spoke to Mona Sonnenshein and Tom Riles and agreed to discuss the situation at 9:00 the next day. During the Wednesday morning meeting Dr. Ren and Dr. Riles agreed that Dr. Pal's phone calls to patients exhibited such an egregious lack of professional judgment and lack of concern for patient welfare that they needed to summarily suspend her. Dr. Ren described her subsequent calls to UMDNJ as an attempt to understand where Dr. Pal's unexpected behavior had come from. She summarized her findings in a letter to Dr. Riles (attached), which were restated in

4

**D 00292**



his dismissal letter. In light of the UMDNJ information, Dr. Ren believed that the phone calls to patients were not necessarily an aberration, but rather a part of a pattern of behavior exhibited over a period of time. Dr. Ren stressed how harmful the act of contacting patients with frightening and false information was to their particularly vulnerable patient population. Dr. Ren stated that Dr. Pal was not shy about discussing the coverage issues and her concern about signing H&Ps and believed that she and Dr. Fielding had been responsive to any issues that Dr. Pal had raised.

The Committee concluded that Dr. Ren's recommendation to dismiss Dr. Pal was carefully considered and made in accordance with applicable procedures and not made arbitrarily, capriciously, in bad faith or in violation of anti-discrimination or other laws or regulations.

### 4.  April 10, 2006: Dr. Carol A. Bernstein, Vice Dean for Graduate Medical Education

Dr. Bernstein reviewed the meeting that she had with Dr. Pal on Tuesday, January 24, 2006 (the day before she was summarily suspended). Dr. Bernstein stated that Dr. Pal contacted her on Monday, January 23rd, requesting the meeting to share her concerns about the Bariatric Surgery Fellowship Program. Dr. Bernstein stated that the email that she received from Dr. Pal (attached) sums up their meeting quite accurately and then recounted the matters discussed. After their meeting, Dr. Bernstein advised Dr. Pal to talk to Drs. Ren and Fielding to tell them what had happened over the weekend and to let them know her concerns. Later that night Dr. Fielding called Dr. Bernstein expressing concern about Dr. Pal, who had admitted to calling the patients and had otherwise been acting strange. Dr. Bernstein was not in the position to explain or diagnose Dr. Pal on the basis of one meeting and a description of some recent worrisome behavior. Dr. Bernstein's only subsequent communication with Dr. Pal was the January 24th email (attached) and accompanying Dr. Pal to the meeting with Drs. Riles and Ren, at which Dr. Pal was provided written notice of her suspension.

The Committee found Dr. Bernstein's account of her meeting with Dr. Pal to be credible and consistent with the information reported by other witnesses.

### 5.  May 3, 2006: Dr. George Fielding, Supervising Attending

Dr. Fielding gave the background of how Dr. Pal matched for this fellowship and how their relationship had been quite good until just prior to the patient phone calls. Dr. Fielding reported that Dr. Pal's response to the patient death was the first sign that things were not right. He described the case clinically and noted that the interchange between Dr. Pal and the intern had been oddly antagonistic. While Dr. Fielding clearly told Dr. Pal that she was not expected to bear responsibility for the incident, Dr. Pal admitted to having gone to the Medical

5

D 00293



<u>PRIVILEGED AND CONFIDENTIAL</u>

Records Office to take photographs with her cell phone of hospital records to support herself, in case anyone came after her. He told her to delete the photos immediately. Dr. Fielding reiterated the opinions expressed in his e-mail to Max Cohen (attached) stating that Dr. Pal was in no way overworked and that nothing was falling through the cracks due to the extent of her responsibilities. Dr. Fielding's account of the weekend of January 21-22, 2006 and the following Monday was consistent with the other witnesses interviewed. The patients with whom he spoke had received calls from a woman with an accent who claimed to work at NYU, and warned that their scheduled procedures were unsafe, that they should cancel and that they should report the bariatric service to the authorities. Dr. Fielding described the alarm that this caused and how he and Dr. Ren reshuffled the OR schedule and tried to calm their patients on Monday morning. Dr. Fielding supported the decision to suspend and ultimately dismiss Dr. Pal.

The Committee concluded that Dr. Fielding's interview was credible and consistent with the information reported by other witnesses and that his concurrence with the decision to dismiss Dr. Pal was carefully considered and made in accordance with applicable procedures and not made arbitrarily, capriciously, in bad faith or otherwise in violation of anti-discrimination or other laws or regulations.

### 6. May 3, 2006: Ms. Mara Epstein, Weekend Administrator On Call

Ms. Epstein described the events of January 21, 2006, as stated in the report listed as item #10 of the attached documents. She got a call from Admitting because one of Dr. Fielding's patients had reported that somebody had called him about the surgery and he was requesting a call from Hospital Administration. Ms. Epstein called the patient and asked him about the phone call he had received. The patient told her that a woman called him in the morning, saying that she was an OR Nurse and had called to tell him that she had seen a lot of patients die from the procedure he was scheduled for, that the program is under review, that it was going to be closing, and that he should think about having the surgery someplace else. The patient was obviously distressed. Ms. Epstein called Amy Horrocks for further instruction and then called Dr. Fielding. She described the patient and Dr. Fielding said he would check the medical record. Dr. Fielding called back to tell her he knew who the patient was and that he believed his story. Ms. Epstein called Mona Sonnenshein, who asked that Dr. Fielding call her directly. Ms. Epstein's last action in connection with this matter was to call Dr. Fielding back and request that he contact Ms. Sonnenshein.

The Committee found Ms. Epstein's account of her interactions with the patient to be credible and consistent with the information reported by other witnesses



6

D 00294



PRIVILEGED AND CONFIDENTIAL

### 7. May 3, 2006: Dr. Neelu Pal, Bariatric Surgery Fellow

Dr. Pal and Jason Solotaroff, Esq. introduced themselves. Dr. Pal distributed a written statement regarding the disciplinary action and appeal and read the statement aloud to the Committee. A string of email was attached to the statement. Both the statement and email is attached to this report. Following the recitation of her statement and the committee's review of the attached email, Dr. Charap asked Dr. Pal if she thought there were alternatives to calling the patients to deal with her concerns about patient care. He asked whether she thought there was any other way to turn. Dr. Pal referred the committee to the statement and the email. She felt that she had made multiple complaints that had not been addressed and that there was nothing else to be done. Dr. Lembo asked Dr. Pal to give some sort of timeline describing her complaints about patient care up until the day that she was suspended. Dr. Pal again referred the committee to the statement and attached email.

After a brief recess, Mr. Solotaroff addressed the committee indicating that Dr. Pal wanted to answer the earlier questions, in spite of his reservations. Dr. Pal recounted her experience, stating that believed there was a deficiency in post-operative coverage, she disagreed with the H&P procedure and she disagreed with the procedure for obtaining informed consent. She claimed to have expressed these concerns to Drs. Ren and Fielding a number of times. Dr. Pal also complained of the lack of general surgery house staff coverage. Dr. Pal emphasized that the email attached to her statement was sent to a number of people due to her concern that nothing had been done in response to earlier complaints to her immediate supervisors. Dr. Pal also recounted the course of the patient who had died and the patient who had had life threatening hypotension. Dr. Pal's version how the M&M case study was drafted differed from that of Drs. Ren and Fielding. Dr. Pal said that on the weekend of January 21-22, 2006, she felt compelled to call the patients and inform them of the investigation into the patient death and that the program was under review. She admitted that she refused to identify herself because she was concerned about repercussions. Dr. Pal claimed that she did not mean any harm to the patients.

The Committee concluded that while Dr. Pal may have genuinely felt concern about the bariatric surgery patients and the program in general, her behavior could not be justified by such concern. Prior to directly contacting and scaring patients, Dr. Pal had not exhausted or even attempted a number of other reasonable alternatives to taking such drastic action. Furthermore, calling patients, not as an identified physician, but under pretext as a concerned non-physician observer fell far outside the norms of acceptable professional behavior. Therefore, her testimony did not show that the disciplinary action was taken in violation of applicable procedure or that the decision of the Department was made arbitrarily, capriciously or in bad faith or in violation of anti-discrimination or other laws or regulations.

7



<u>PRIVILEGED AND CONFIDENTIAL</u>

### III.   <u>CONCLUSIONS AND RECOMMENDATIONS</u>

In reaching the conclusions set forth below, the Committee considered all of the information provided to it by Dr. Pal and each of the people interviewed, as well as the documents listed above.  While there were some inconsistencies in the information presented by Dr. Pal compared to that presented by the interviewees, the Committee determined that there were no differences that were material to its conclusions and recommendations.

*Was the decision to suspend Dr. Pal made substantially in compliance with the procedures set forth in the Evaluation, Corrective Action, and Disciplinary Policy?*
*YES.*
*Was the decision to suspend Dr. Pal arbitrary and capricious or made in bad faith or in violation of anti-discrimination or other laws or regulations?*
*NO.*

There was unanimous agreement that Drs. Ren and Riles' decision to summarily suspend Dr. Pal was warranted given the extremely unusual behavior exhibited by phoning patients to warn them against surgery during the weekend of January 21-22, 2006, which they felt put patient safety and welfare at risk.  We believe that, after reviewing the description of the phone calls and the context in which they were made, Dr. Ren had reasonable cause for concern for patient welfare, which, according to Section the Evaluation, Corrective Action, and Disciplinary Policy provides grounds for summary suspension.

*Was the decision to dismiss Dr. Pal made substantially in compliance with the procedures set forth in the Evaluation, Corrective Action, and Disciplinary Policy?*
*YES.*
*Was the decision to dismiss Dr. Pal arbitrary and capricious or made in bad faith or in violation of anti-discrimination or other laws or regulations?*
*NO.*

There was unanimous agreement that Dr. Riles' decision to accept Dr. Ren's recommendation to terminate Dr. Pal was also warranted.  We believe that, after careful consideration of the incident and behavior described by Drs. Ren, Fielding and Bernstein, Dr. Riles made a reasonable decision to terminate Dr. Pal in the interest of patient safety and welfare. Dr. Riles expressed his confidence in Dr. Ren's judgment and concurred with her analysis of what disciplinary action would be appropriate in this situation. According to the Evaluation, Corrective Action, and Disciplinary Policy, the Department Director may dismiss a resident for conduct that threatens the welfare or safety of patients or the integrity of the training program.

The Appeals Committee unanimously recommends that the summary suspension and termination should be upheld.

If you have any questions regarding any aspect of this investigation or our recommendations, the Committee is available to meet with you.

8

**CONFIDENTIAL**                                                                                          **D 00296**