USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 6, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

NEELU PAL, M.D.,                                  :

                Plaintiff,                    :

        v.                                          06 Civ. 5892 (PAC)(FM)

                                              :       MEMORANDUM OPINION & ORDER

NEW YORK UNIVERSITY,

                                               :

               Defendant.

------------------------------------------------------------x

      HONORABLE PAUL A. CROTTY, United States District Judge:

      This is a fraudulent inducement and whistle blower action instituted on August 6, 2006 by plaintiff Neelu Pal ("Pal") who alleges that defendant New York University School of Medicine ("NYU") fraudulently induced her, in violation of New Jersey law, to take a fellowship in NYU's bariatric surgery program; and thereafter fired her in retaliation for her complaints about the bariatric surgery program's substandard conditions and patients' care, in violation of New York Labor Law § 741, also known as "New York's Health Care Whistle Blower Law."

      On August 23, 2007, the Court granted NYU's Fed. R. Civ. P. 12(b)(6) motion to dismiss Pal's fraudulent inducement claim (Order dated August 23, 2007, Docket No. 45).

      Discovery followed, supervised by U.S. Magistrate Judge Frank Maas. Discovery revealed certain facts which are not disputed. On Saturday, January 21, 2006, Pal called bariatric surgery patients, who were to be operated on the following week, and said in substance that NYU's operating procedures were substandard and that their forthcoming surgery was not safe. Pal called anonymously. Upon investigating, NYU determined that Pal made these anonymous calls. She was suspended and subsequently terminated.

NYU moved for summary judgment on Pal's retaliation discharge claim. On August 29, 2009, the Court entered the following order:

> In connection with the oral argument of the motion for summary judgment, now scheduled for Monday, September 21, 2009 at 3:00 p.m., the Court has determined that the plaintiff's secret, anonymous communications and disclosures, during the weekend of January 21 and 22, 2007, to patients scheduled for bariatric surgery during the following week, are not protected by New York Labor Law § 741 because they were not made to a "public body" or a "supervisor," as required by statute.
>
> Argument should address whether there were other communications or disclosures which fell within the statute, and whether plaintiff's termination was in retaliation for said communications and disclosures. (Order, dated August 20, 2009, Docket No. 81).[1]

NYU argued that Pal was suspended and subsequently terminated as a fellow because of her inappropriate phone calls to pre-operative patients, not because of any complaint about patient care. Pal maintained that her termination was attributable to her complaints about inadequate patient care. Those complaints were made to a person authorized by NYU to receive complaints. The Court denied summary judgment, determining that there was a genuine factual dispute over whether Pal was terminated because she made inappropriate phone calls; or because she expressed her concern over the quality of patient care at NYU. (Memorandum Opinion and Order, dated January 25, 2010, Docket No. 86).

---

[1] New York Labor Law § 741 provides: "Prohibition; health care employer who penalizes employees because of complaints of employer violations . . .

  2. Retaliatory action prohibited. Notwithstanding any other provision of law, no employer shall take retaliatory action against any employee because the employee does any of the following:

  (a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitute improper quality of patient care."

"Supervisor" and "public body" are defined in New York Labor Law § 741(1)(e)(g) and neither definition covers disclosures to hospital patients.

2

The case was tried by the Court on May 3-6, 2010.[2]  Pal called ten witnesses, including eight witnesses who were employed by NYU.  At the conclusion of Pal's case, NYU moved for judgment pursuant to Rule 52(c) of the Fed. R. Civ. P.  The Court held separate conferences with counsel for Pal and NYU at which the parties were encouraged to settle.  The parties reached a preliminary agreement to resolve their differences, but they were unable to enter into a final settlement agreement.

The Court now turns to defendant's pending Rule 52 motion.

Both sides agree that there are three elements to establishing a retaliation discharge claim under New York Labor Law § 741:  (1) plaintiff must act in good faith and have a good faith belief that NYU was engaging in practices that constitute improper quality of care; (2) plaintiff engaged in protective activity; and (3) Pal was terminated because she engaged in protective activity (Trial Tr., pg 600, 617).  Further, the parties stipulated that Pal had acted in good faith, thereby satisfying the first element.  The resolution of the matter depends on how the second and third elements are decided.  (Id. at 600-601, 617).

At the commencement of the trial, Pal's counsel outlined Pal's theory of recovery:

> (1)  Pal was not fired because of the telephone calls she made to the patients who were to be operated on.
>> (a)  Doctors Ren and Fielding knew about the phone calls and "were willing to let it slide", rather than impose any discipline.
>> (b)  The real reason Pal was fired was because of Pal's complaints to Dr. Bernstein about the conditions in NYU's bariatric surgery program run by Drs. Fielding and Ren.
>> (c)  As soon as Drs. Fielding and Ren learned of Pal's disclosure to Bernstein, they began to malign, disparage and discredit her, accusing Pal of "erratic" and "weird" "psychotic" behavior.

---

[2] The Memorandum Opinion and Order, dated January 25, 2010, also struck Pal's jury demand, pursuant to Fed. R. Civ. P. 39(a)(2).  The New York State law claim is equitable in nature and thus outside the purview of the Seventh Amendment jury trial provision.

>   (2)  NYU tolerated far worse conduct by others, and NYU would forgive those transgressions, but not Pal's because she complained about the system.[3]
>   (3)  NYU has no credible explanation for termination of Dr. Pal. The NYU senior medical staff cannot explain the termination; and the explanations lack credibility. They offer no coherent explanation for how the decision to terminate Pal was reached.
>
>   (Trial Tr., pgs 3-8)

The question to be resolved is whether NYU's suspension and termination of Pal was due to her anonymous and inappropriate phone calls to patients or because of her complaints to Dr. Bernstein about the substandard quality of patient care at NYU.  For the reasons set forth below, the Court finds that NYU has proved by a preponderance of the credible evidence that Pal was suspended and terminated because of her anonymous and inappropriate phone calls to pre-operative bariatric surgery patients.  Her suspension and termination cannot be attributed to Pal's subsequent expressions of concerns about patient safety to Dr. Bernstein.  Her complaints and concerns were not made until January 24, 2006, long after her wrongful conduct had occurred; and were more concerned about her being blamed than patient safety.  Her January 24, 2006 e-mail to Bernstein must be viewed as an attempt by Pal at damage control, rather than a complaint about improper quality of patient care.

In October, 2005, Pal began working as a fellow in the NYU Program for Surgical Weight Loss under the supervision of Drs. Christine Ren ("Ren") and George Fielding ("Fielding"), who are both attending surgeons and associate professors of surgery at NYU.  They are partners in their medical practice and they are married.  Ren is also the Director of NYU's Weight Management Program.

---

[3] Pal attacks Ren's integrity and credibility, for example, because Ren allowed unlicensed (in N.Y) fellows to practice medicine under her supervision. This is a serious transgression, but it pales in comparison to Pal's conduct. Ren's conduct is not an appropriate comparator because it is different in both kind and degree from Pal's conduct.

As a fellow, Pal would assist Ren and Fielding perform surgery. She also performed other tasks, including, reviewing patients' medical histories and physical examinations ("H & P's"), obtaining consents from patients, and writing orders for post-operative care.

Pal's relationship with Fielding and Ren was initially friendly. Indeed, Fielding and Ren had Pal and her husband over for dinner on at least one occasion. As shown by text messages between Pal and Ren, their friendly association continued, at minimum, through December, 2005. (Def. Ex. C2). Up until January, 2006, Fielding thought Pal's performance as a fellow was "excellent," and he thought Pal was of "very high caliber." (Trial Tr., pg 14).

Pal testified that she got along "relatively well with the people" at NYU. (Trial Tr., pg 449). As she settled into her fellowship, however, she said she became concerned for the safety of the patients in the Surgical Weight Loss Program. Pal noted there were incomplete and erroneous H&P's prepared for patients prior to surgery. (Trial Tr. at 450). Further, there was inadequate post-operative coverage for patients staying in the hospital after their surgeries. (Trial Tr. at 452). Pal voiced her concerns to Ren and Fielding concerning both the H&P's and post-operative coverage. Fielding told her "you don't need to worry about it, just calm down, take a deep breath, game over." (Trial Tr. at 451). On December 13, 2005, she sent an e-mail to a number of her superiors, including Ren and Fielding, expressing her concerns. (Pl. Ex. 31). No discipline was imposed on Pal for raising these concerns.

On or about January 12, 2006, Pal assisted Fielding perform bariatric surgery on an obese female patient at NYU. Two days later, in the early morning of January 14, 2006, the patient died.[4] The death had an effect on all involved, including Pal. Dr. Fielding testified that a patient

---

[4] There is a dispute over the level of care this patient received. An intern called Pal at home on January 13, 2006 to report on the patient's condition. But Pal did nothing and did not return to the hospital. The patient passed away hours later. In preparing the morbidity and mortality report ("M&M") on the deceased patient, Pal said she did not want to turn the issue of patient safety into a "blame game for the intern." (Trial Tr. at 467). That is what the initial

5

death was "a terrible thing." (Trial Tr., pg 17). As it would turn out, Pal was more concerned that she would be blamed for the death, than she was about the quality of care.

On January 19, 2006, another bariatric surgery patient became hypotensive (low blood pressure). At Pal's suggestion, the patient was taken back into the operating room to ensure there was no internal bleeding. After finding the patient had no internal bleeding, Fielding then left the hospital. Pal felt that Fielding should have stayed, but he left to go to a basketball game. (Trial Tr. at 475). It was later determined that the patient had suffered an adrenal crisis. After consultation with an anesthesiologist, Pal suggested steroids to increase the patient's blood pressure. The patient's blood pressure returned to normal and the patient recovered. According to Pal, the adrenal crisis might have been avoided had an adequate preoperative H&P been obtained.

Following these two incidents, Pal examined 23-25 patients' charts who were scheduled for surgery, starting on the following Monday, January 23, 2006. She claimed to observe inconsistencies and discrepancies in the H&P's for the patients; and brought them to Ren's attention. According to Pal, Ren was "quite dismissive." (Trial Tr. at 478).

On Saturday, January 21, 2006, Pal took it upon herself to personally contact the patients and "alert" them about her concerns over the patient care at NYU. When she arrived at the hospital, she went to the "same day admit" hospital operating area, a secure, limited access area, retrieved patients' phone numbers from the hospital computer database, and proceeded to call 17 or 18 patients. (Trial Tr. at 479). Pal reached and spoke with at least three patients.

The parties continue to dispute over exactly what Pal said to the patients. Dr. Fielding testified that the patients who were called were told that NYU was "killing people." (Trial Tr. at

---

M&M suggested however. The M&M report went through several drafts. The Court need not comment further on the specifics of the case, except to note that it raises questions about the quality of care, as well as Pal's concerns about being blamed.

33).  Dr. Ren testified that Pal told the patients that the "program was under investigation" and that they "should report us to a government agency" (Trial Tr. at 107).  Pal objected to the admission into evidence of NYU's records indicating that what the anonymous caller said and the suggestions she made that patients take more drastic actions.  The Court, for this limited purpose, accepts Pal's version of what she said:

> "I told them I worked in the operating room at NYU, that I was calling them because I was concerned about some of the conditions there relating to their surgery or their upcoming surgery, that I had witnessed multiple complications and one recent patient death, that there was some kind of investigation going on with the program and then I suggested to them that they speak to Dr. Ren and Dr. Fielding and possibly the hospital administrator to make sure that conditions for their surgery were safe."  (Id. at 479-480).

She identified herself to the patients she spoke with as "someone who worked in the operating room at NYU."  Pal, however, did not disclose her name, nor did she say she was a doctor on the N.Y.U. staff.  (Trial Tr., pg 479).  Even at trial, Pal could offer no explanation for why she proceeded anonymously.  (Id. at 480).  She did not tell Dr. Ren about her communications with the patients, until Tuesday afternoon, January 24, 2006, long after Saturdays calls.  Pal admitted that she knew that calling patients was wrong (Trial Tr., pg 562, 568) and that NYU provided alternative methods and means to raise any concerns about patient care.  (Trial Tr., pg 568).

It must be noted that Pal had previously voiced her concerns about the surgical weight loss program directly to various NYU personnel, including Doctors Ren and Fielding.  This makes her behavior all the more inexplicable—and certainly Pal offered no explanation—why she took it upon herself to proceed to call patients and to do so anonymously.  She recognized what she was doing was wrong, but did it anyway.  She testified she felt "terrible" after making

7

the calls, saying that it "did not feel right." (Trial Tr. at 480 and 481). Pal understood that calling patients and advising them as she did was grossly inappropriate.

NYU soon learned of the anonymous calls. NYU's admitting office was contacting the same patients to facilitate their admission. The admissions office immediately called Dr. Fielding to advise him that patients were being called and told not to come in for surgery. (Trial Tr. at pg 32). Fielding and Ren then proceeded to call the involved patients to reassure them about the safety of their scheduled surgeries. All the patients appeared as scheduled for surgery; surgery was performed; and the results were satisfactory. (Trial Tr. at pg 35).

Pal reported to work as usual on Monday, January 23, 2006, but said nothing about her calls. She began working with Dr. Ren on obtaining a patient "consent" from one of the patients who Pal had spoken to on Saturday. Pal testified that the patient was very upset and tearful (Trial Tr. at 482), but Pal continued to maintain her anonymity. Pal then proceeded to assist Ren and Fielding in surgery, where she was allowed to operate as the lead surgeon on two patients. By mid-day, but before all scheduled surgeries were completed, Pal told Ren and Fielding that she felt ill and wanted to leave work. When she arrived home, she called Dr. Carol Bernstein, NYU's Associate Dean for graduate medical education. They scheduled a meeting for the next day, Tuesday, January 24, 2006.

NYU wanted to know who was responsible for making the anonymous calls. Bruce Baulch, an employee in NYU's technical department, was directed to ascertain where the anonymous calls were made from; and if possible, to determine who made the calls. By the afternoon of January 23, 2006, Baulch determined that the Saturday, January 21, 2006 calls were made from the same day surgery area. This area is a restricted space and a security swipe card is

needed to gain access.  Baulch ascertained that Pal was the only person who swiped into the area on Saturday, at the time when the calls were made (Trial Tr. at 354 et seq.).

This is the first that anyone knew of Pal's role in making the anonymous calls.  Her testimony that Dr. Ren and Dr. Fielding must have known of her role by early Monday is sheer speculation, designed to support her legal theory of recovery, but totally lacking in factual support[5].  If there were changes in Ren's and Fielding's behavior on Monday, as Pal claimed, it was because of the phone calls, which (quite naturally) put everyone on edge.  Both Dr. Ren and Dr. Fielding denied knowing of Pal's role until Monday afternoon, at the earliest.  The Court credits their testimony as to when they first learned that Pal made the anonymous calls.

On Tuesday, January 24, 2006, Pal did not go to work.  She went into the hospital later that day to meet with Bernstein.  At their meeting, Pal told Bernstein that she was concerned about the patient care at NYU.  Pal then admitted that she made the anonymous calls that previous weekend, which Pal described as something she should not have done.  (Trial Tr. at 323).  Bernstein, who is also a psychiatrist, testified that while Pal appeared upset and scared (Trial Tr. at 286), her primary concern was not with patient safety.  Instead, Bernstein concluded that Pal was concerned that she was "going to be blamed, if there were things that went wrong in the care of patients, . . . [she] was frightened and scared that she was going to be blamed for the death of this patient" (who died on January 14, 2006) (Trial Tr. at 306).

After the meeting, Pal sent Bernstein a follow-up email, at 8 p.m. on January 24, 2006, purportedly memorializing their earlier conversation (Pl. Ex. 15).  Bernstein was "surprised at the way she chose to characterize their meeting . . . She started off [the e-mail] by talking how I definitely felt better after sharing my concerns regarding patient care which was certainly not the

---

[5] Pal's argument that because the anonymous caller was a woman , who worked at NYU, was concerned about patient safety and spoke with an accent (all attributes of Pal–and many others, as well) that Ren and Fielding must have known Pal was the caller is rejected as sheer speculation (Trial Tr. at 32-34; 121-123).

thrust of the meeting I had with her" (Trial Tr. at 308). The main thrust was Pal's worry "that she was going to be blamed for things she didn't do" (Trial Tr. at 309). At their meeting on January 24, 2006, Bernstein asked Pal not to say anything further, but Pal reported in her email that she had talked to Dr. Ren and confessed that she made the calls. Ren was upset. The Court credits Bernstein's account of the meeting and finds that Pal's concerns were of a personal nature and were not primarily about patient care, or the quality of care patients were receiving.

Also on Tuesday, January 24, 2006, Dr. Thomas Riles ("Riles"), the Chairman of the Department of Surgery, was informed that Pal had made the anonymous calls. Riles used a previously scheduled meeting for Wednesday, January 25, 2006, to review what had happened. Riles, Ren, Fielding, and Ms. Lyn Lowy, an attorney for NYU, attended. (Trial Tr. at 227). Upon review, in which everyone was given an opportunity to voice their opinions and make recommendations, the unanimous consensus was that Pal should be suspended. Riles, however, had the ultimate authority to decide on Pal's suspension. (Trial Tr. at 228). After their meeting, Riles met with Pal and handed her a letter, dated January 25, 2006, notifying her that she was suspended pending further investigation. (Def. Ex. A1). Riles found that Pal presented a threat to the welfare of patients and suspended Pal pursuant to Section IV(A) of NYU's Evaluation, Corrective Action and Disciplinary Policy for Residents.

Even after learning of Pal's complaint to Bernstein about Ren and Fielding, they were willing to support Pal to remain as a fellow. On February 4, 2006, they emailed Dr. Max Cohen ("Cohen"), Chief Medical Officer at NYU. Subsequently, they reversed that position, however, and on February 9, 2006, Ren emailed Cohen revoking their earlier support for Pal's retention. Ren testified that she came to realize the gravity of the situation after a meeting with a patient and could not maintain her support.

NYU Disciplinary Policy, Section IV(E), provides that the Director, Ren, shall recommend whether a fellow be dismissed to the Department Chair, Riles. (Def. Ex. Y). Section IV(E)(ii) calls for dismissal if a fellow "engaged in a conduct that threatens the welfare or safety of patients." Id.

On February 16, 2006, Riles convened another meeting with Ren, Fielding, Bernstein and Cohen to discuss how to proceed with Pal. They unanimously agreed that Pal should be terminated. (Trial Tr. at 233). While the consensus was unanimous, NYU Disciplinary Policy dictated that the final determination on termination was to be made by the head of surgery, Dr. Riles. Riles testified that he alone decided to terminate Pal. (Trial Tr. at 233-234). In making his decision to terminate Pal, Riles was aware of the Pal's complaints and her conversations with Bernstein. Nonetheless, his decision to terminate Pal was based on the anonymous calls she admitted making. In his view, she had endangered patient safety. Pal's conduct was neither an accident nor a mistake; it was deliberate. Pal provided false information to pre-operative patients who were both vulnerable and frightened. Delaying or postponing surgery was a risk to the patient's health (Trial Tr. at 195-196, 234-235). Riles testified that Pal's reported concerns to Bernstein about patient safety had absolutely no effect on his decision. Riles is a wholly credible witness, and the Court finds his testimony truthful and reliable.

On February 21, 2006, Riles sent Pal a letter terminating her employment with NYU, effective February 22, 2006. (Def. Ex. F1). The letter recounted the specifics of Pal's calls to patients and stated that, in Riles words, "I am taking this action due to my belief that your continued participation in the program would threaten the welfare and safety of patients, employees, or other staff members or the integrity of the residency training program."

11

Pal appealed her suspension and termination.  Pursuant to Section V of NYU Disciplinary Policy, a committee of two residents and two attending physicians was convened.  Following a hearing, the committee, in a written decision dated May 30, 2006, unanimously upheld Pal's suspension and termination.  Pal commenced this lawsuit in August, 2006.

**DISCUSSION**

Federal Rule of Civil Procedure 52(c) provides:  "If a party has been fully heard on an issue during a non-jury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim . . . that, under the controlling law, can be maintained . . . only with a favorable finding on that issue."  See MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 157 F.3d 956, 959 n.2 (2d Cir. 1998) See also Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 194 (2d Cir. 1996).  Rule 52(c) "authorize[s] a dismissal at the close of the plaintiff's case if the plaintiff ha[s] failed to carry an essential burden of proof."  LaMarca v. United States, 31 F. Supp. 2d 110, 123 (E.D.N.Y. 1998) (alteration in original) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 52(c)); see also Wechsler v. Hunt Health Sys. Ltd., 330 F. Supp. 2d 383, 433 (S.D.N.Y. 2004).  Unlike Rule 50, which governs judgment as a matter of law in jury trials, under Rule 52(c), "the court does not consider the evidence in the light most favorable to the non-moving party", but rather weighs the evidence, resolves any conflicts and determines for itself where the preponderance of evidence lies.  Id.

New York Labor Law § 741(2) prohibits employers from taking "retaliatory action" against an employee who "discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care."  The Court has previously ruled that § 741(2) does not protect anonymous disclosures to pre-operative patients.  The same statute

also provides the employer with a defense that "the (adverse) personnel action was predicated upon grounds other than the employee's exercise of any rights protected by this section." NY Labor Law § 741(5) See Luiso v. Northern Westchester Hosp. Center, No. 2008-03026, 2009 N.Y. App. Div. LEXIS 6684 (2d Dep't 2009) (defendant obtained summary judgment dismissing a Section 741 claim because it established that the plaintiff had been transferred out of her management position in the operating room based on her work performance); and Timberlake v. New York Presbyterian Hospital, No. 05 Civ. 5616 (LAP), 2009 U.S. Dist. LEXIS 89949 (S.D.N.Y. Sept. 20, 2009) (defendant prevailed on its motion for summary judgment on the plaintiff's 741 claim after offering "ample evidence" that the plaintiff's reprimand and termination were based on her insubordination and deficient performance).

In the instant case, Pal contends that her complaint to Bernstein about her concerns regarding patient safety at NYU resulted in her suspension and termination. The parties stipulated that Pal had a "reasonable, good faith belief" that NYU engaged in improper quality of patient care. (Ex. 28). She did express, albeit after the fact, those concerns to her employer and she was subsequently suspended and then terminated. This is a sufficient showing to shift the burden to NYU to demonstrate that Pal's termination was not due to her complaints to Bernstein.

The Court finds that NYU has demonstrated that Pal's termination was not caused by her disclosures to Bernstein; but rather to Pal's egregious conduct on January 21, 2006. Prior to her anonymous calls on Saturday, January 21, 2006, Pal had voiced her concerns to NYU without any reprisals or retaliation. In December 2005, she sent an email to her superiors and directly confronted both Ren and Fielding without adverse consequences. Moreover, Pal concedes that none of her previous complaints prior to January 21, 2006, were the basis for any retaliation or discipline by NYU. (Tr. at 615). There is neither evidence nor contention that anyone at NYU

acted adversely towards Pal because of her expression of concern until after her misguided calls to the patients.

Pal's own actions after her phone calls are best described as self-serving. Pal sought a meeting with Bernstein only after she realized the true consequences of her calling the patients. After her disclosure to Bernstein, Pal sent Bernstein an email purportedly to summarize what was discussed. But the memo masked what Pal's real concern was: fear of being blamed for a patient's death. Her e-mail was an obvious attempt to garner some form of legal protection. The Court credits the testimony of Bernstein who testified that her meeting with Pal was less about patient safety, and more about Pal's concerns for herself. Bernstein recognized that Pal's email, dated January 24, 2006, was "a set-up for . . . a way for [Pal] to protect herself." (Trial Tr. at 309). Bernstein was a credible witness; and the Court credits her testimony, including her description of the January 24, 2006 meeting and the purpose of Pal's subsequent email.

Pal's termination was not because of her complaints about patient care at NYU, but rather because she made grossly inappropriate, inexplicable, anonymous phone calls to patients who were already anxious about their forthcoming surgery. Her calls created risk to the patients' health. The Court recognizes Ren and Fielding had mixed motives, and frequent changes of position on retaining or terminating Pal. The Court finds that they were not responsible for NYU's decision to terminate. Instead, Riles, as the Department Chair, had the sole authority to suspend and terminate Pal; and after consulting with others, he came to his own conclusions based primarily on the fact that Pal made the anonymous phone calls. The Court finds Riles credible. Riles' actions were made pursuant to the written disciplinary policies of NYU. Riles was entrusted with final decisional authority over the issue, and he discharged his responsibilities in a fair and proper way, in accordance with NYU's written procedures. After Pal's suspension,

Riles took another month to examine and reflect on the findings and consequences of Pal's conduct before deciding that her actions of Saturday, January 21, 2006 were so egregious that she had to be terminated. Accordingly, based on the credible evidence, the Court finds and concludes that Pal's suspension and subsequent termination were not retaliatory actions protected by New York Labor Law § 741(2), but rather, were legitimately based upon her improper, anonymous phone calls to pre-operative patients.

## CONCLUSION

For the foregoing reasons, NYU's Rule 52(c) motion is GRANTED. The Clerk of the Court is directed to enter judgment for NYU and close this case.

Dated: New York, New York
       August 6, 2013

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge